·LOUIS J. DESIDERATO, Plaintiff-Appellant, *v.* JAMES SULLIVAN *et al.*, Defendants-Appellees.

First District (1st Division) No. 79-858

Opinion filed May 27, 1980.

Vincent J. Getzendanner, Jr., of Chicago, for appellant.

William J. Harte, Ltd., of Chicago, for appellees.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

This appeal involves a controversy over the ownership of the family residence. Louis Desiderato (plaintiff) brought suit against his brother James Desiderato, his sister Virginia Sullivan, and his brother-in-law James Sullivan (defendants) to impose a constructive trust on the residence. After trial, the circuit court found in favor of defendants. Plaintiff appeals.

Giuseppe and Angelina Desiderato emigrated to America from Sicily in about 1910. In 1925 they purchased a five-room, two-story bungalow, the property in dispute. There they raised their five children: Joseph, James, Carmella, Louis, and Virginia. Joseph married and left the house around 1930. Although he was served with summons, he did not appear in these proceedings. Carmella died in 1969.

The parties to this suit and their parents occupied the premises for most of their lives. Angelina and Giuseppe lived there until their deaths in 1966 and 1969, respectively. Plaintiff lived there from 1925 to 1975 except for six months. Defendant James Desiderato continued to live there following his years in high school and resides there at present. Virginia lived in the house from 1925 to 1937. Then she moved out and married defendant James Sullivan. Virginia moved back in the house from approximately 1943 to 1945 while her husband was in the service. She and her husband lived there for a short time after the war. They left but returned in 1953 to live there permanently. The Sullivans reside there at this time.

All adults who lived in the house worked to help pay the mortgage, taxes, and other expenses. Giuseppe worked for the phone company for 27 years. He retired in 1942. He subsisted thereafter on his pension and social security benefits and on family contributions. Angelina took in a very small amount of sewing until 1953.

Plaintiff spent a short time in high school. He was employed full time by General Motors for over 30 years. Virginia testified plaintiff suffered a nervous breakdown from 1944 to 1950 and was not employed full time then.

James Desiderato worked at various jobs since high school. This includes employment as a carpenter, musician, cab driver, mechanic, and shipping clerk.

Virginia graduated from high school and worked at a factory. From approximately 1934 to 1941, she worked as a legal secretary. In 1941 she took a job at General Motors and later worked at a law firm. She had a baby about 1944 and soon after worked on a part-time basis. She testified she then did not work until 1950. Since that time Virginia has worked at various office jobs.

The original price of the residence in 1925 was $8500 with a mortgage of $7500. In 1946 the parents placed an additional $5000 mortgage on the house. In 1948 they made another mortgage of $600. In 1949 they obtained a new $5000 mortgage. This consolidated the balances due on the two prior loans and resulted in monthly payments of approximately $50. Virginia testified money from two of these mortgages was used to help free plaintiff from jail. Plaintiff, however, testified he was not in jail. He stated his father gave him a loan of $900 from the 1949 mortgage proceeds and he repaid this loan.

After World War II, Virginia, her husband and their child lived in a veterans' housing complex. An arrangement was made whereby they would move in with the Desideratos. In 1953, Virginia, her husband, and the senior Desideratos took out a new mortgage loan for $12,500. The new mortgage paid the existing balance under the 1949 mortgage of $3400 and

provided $9100 to construct an additional six rooms. There were four rooms on the second floor as an apartment for the Sullivans and two on the first floor for the rest of the family. This mortgage indebtedness was reflected in a monthly mortgage payment of $135. Each month the parents paid $50 of that payment until the $3400 was paid off, and the Sullivans (Virginia and her husband) paid $85 of it. From 1953 to 1956, Giuseppe handled the mortgage payments. In 1956 Virginia commenced to make the payments. She also began to collect the money and pay other bills relating to the house.

The Sullivans moved into the house in October 1953. Plaintiff testified he and his brother James continued to pay $25 to $30 a week for room and board from that date until 1969. Giuseppe paid $50 a month on the mortgage until it was paid off. The senior Desideratos paid half the real estate taxes, and the Sullivans paid the other half. Each of the two apartments had its own electric and gas meters.

On December 5, 1960, a conveyance was made which resulted in vesting title in the Sullivans as joint tenants with the senior Desideratos. Virginia testified Giuseppe asked her to call Anna Olson at the law firm of Boyle, Murphy and Nelson and to request the necessary papers which would allow the Sullivans' name to appear on the title. Virginia said, "I did not do it on my own." Giuseppe asked that the papers be brought over to the house to be signed. Virginia made the call in her father's presence. This law firm had previously made some of the mortgage loans to the family.

On that date Mr. Motto, an attorney associated with that firm, and Anna Olson, an employee who had assisted Giuseppe in arranging his previous mortgages, brought the necessary documents to the house. The documents conveyed Giuseppe and Angelina's title by quitclaim deed to Anna Olson. She then conveyed the property by quitclaim deed to Giuseppe, Angelina, Virginia, and her husband in joint tenancy. Virginia denied that at the time she knew the difference between joint tenancy and tenancy in common. There was no money consideration paid for executing the deeds.

Those present at the signing included Giuseppe, Angelina, Virginia, James Sullivan, Carmella, Anna Olson and Mr. Motto. Virginia testified James Desiderato was there, but his testimony on that fact is inconsistent. In his deposition he stated he was present; at trial he first said he did not recall, then he was present, and finally he was not.

Plaintiff testified he did not know about the transfer and the conveyance was kept secret from him. He learned of it only upon checking title after his father's death. Virginia admitted she never told plaintiff about the transfer. James Desiderato testified he never told plaintiff his parents intended to convey title. James, however, stated

plaintiff could have been present at the signing but was not. James Desiderato and Virginia had previously discussed the transfer with their parents.

Plaintiff testified he might have been present without realizing it. He testified he saw his father and sister talking to a man he did not recognize and signing papers. Virginia said they were insurance papers. At Virginia's direction, plaintiff led his mother up the stairs so she could sign there. Plaintiff testified the man who was there might have been Mr. Motto, but no woman was present.

At the time of the transfer, Giuseppe was approximately 86 years old, and Angelina was approximately 77. Giuseppe was in very good health. While he had two operations for cataracts 11 years before, he could see with glasses. Virginia testified he "saw beautifully." Angelina's health was good, and she could "dance you around this room." Plaintiff said neither could speak English, but there was some testimony that they could speak broken English. Plaintiff stated neither could read English, but then said Giuseppe could read English to a limited extent. James Desiderato stated both parents read English. Both were in command of their faculties. Giuseppe had been a policeman in Italy. He had the apparent equivalent of a high school education.

The attorney, Mr. Motto, spoke Italian, as well as English. Although there was testimony that Giuseppe had another lawyer, Mr. Motto's firm had handled the financing and refinancing of the house over the years. Virginia had never met him before. At trial, Mr. Motto did not recall what he specifically stated to the Desideratos, but he did recall conversing with them at the time of the transaction. A bill for legal fees was issued to and paid by Virginia.

When plaintiff found out about the deeds in 1970, he talked to James Desiderato about it. James said the title to the property would not matter since Virginia would not cheat them. Plaintiff testified Virginia said there was nothing to worry about and they would get their share. Plaintiff said at one time Virginia offered to sell the house to him and James. Virginia denied making any promises to plaintiff, but she averred her brother James was part owner of the house because, in her mind, Giuseppe left James half the house. She in fact stated she left James half the house in her will, but said later this was not "final and definite" because she had to advance $10,000 to bring the building up to compliance with the city code.

In 1962, plaintiff pleaded guilty to a Federal indictment for mail fraud and counterfeiting. He was sentenced to a five-year suspended term and probation. In 1964, he filed a voluntary bankruptcy petition.

In 1966, Angelina died. Giuseppe continued to live on the first floor

with plaintiff and James Desiderato. Virginia took care of the paperwork for the family at that time.

In 1969, some 9 years after the conveyance, Giuseppe died. He was then over 90 years old. Virginia and her husband thereupon became owners of the residence by virtue of their rights of survivorship. The remaining family members continued to reside together. Plaintiff and James lived on the first floor and shared expenses with the Sullivans. As the mortgage had been paid off, the remaining expenses were divided between the first and second floors. These expenses included metered utilities, real estate taxes, and water bills. No one paid any rent.

In 1975, an argument between plaintiff and Virginia and her husband ensued. Plaintiff left the premises. James presently resides on the first floor alone and pays half the expenses while the Sullivans pay the other half.

In this court, plaintiff contends the conveyance should be set aside and a constructive trust be imposed on a portion of the premises. He urges a fiduciary relationship existed between Virginia and her parents. As a fiduciary, Virginia had the burden of showing the transaction was fair. Plaintiff contends she failed to meet this burden. In addition, certain testimony and exhibits offered by the plaintiff should not have been excluded.

■■ Generally, a constructive trust will be established upon a showing of "actual fraud" or the existence of "a fiduciary or confidential relationship and a subsequent abuse of such relationship." (*Edwards v. Miller* (1978), 61 Ill. App. 3d 1023, 1026, 378 N.E.2d 583.) Proof of a confidential or fiduciary relationship requires a showing that "one person has reposed trust and confidence in another who thereby gains a resulting influence or superiority over the other." (*Edwards*, 61 Ill. App. 3d 1023, 1027.) Factors to be considered in determining whether a fiduciary relationship exists include the degree of kinship, disparity of age, health and mental condition, and the extent to which the allegedly servient party entrusted the handling of his business and financial affairs to and reposed faith and confidence in the dominant party. *Malunney v. Meade* (1977), 45 Ill. App. 3d 473, 476, 359 N.E.2d 1091, citing *Wold v. Wold* (1976), 43 Ill. App. 3d 773, 776-77, 357 N.E.2d 627, *appeal denied* (1977), 65 Ill. 2d 585; see *Edwards*, 61 Ill. App. 3d 1023, 1027.

It has repeatedly been held that where, as in the case at bar, a fiduciary relationship does not exist as a matter of law, "the proof must be clear, convincing, and so strong, unequivocal, and unmistakable as to lead to but one conclusion." *Kolze v. Fordtran* (1952), 412 Ill. 461, 468, 107 N.E.2d 686.

The first issue to resolve is whether plaintiff proved existence of a

confidential or fiduciary relationship between Virginia and the senior Desideratos by the type of evidence above described. As to the degree of kinship between them, Virginia was their daughter. As such, she, as well as her brothers, enjoyed a close relationship with the parents. Most of the family members lived together in the same house for at least 40 years. But the mere fact of blood relationship does not in itself establish a confidential or fiduciary relationship. *Perry v. Wyeth* (1962), 25 Ill. 2d 250, 253, 184 N.E.2d 861; *Moore v. Moore* (1956), 9 Ill. 2d 556, 560, 138 N.E.2d 562.

There was a natural disparity of age between the Desideratos and Virginia. At the time of the conveyance, Angelina and Giuseppe were getting on in years at about 77 and 86, respectively, while Virginia was approximately 44. But both parents enjoyed good health. They were also in full command of their faculties. In any event, impairment of the mind incident to old age or eccentricities will not by itself render the conveyance invalid so long as the grantor can comprehend the nature of the transaction and protect his own interests. *Kolze*, 412 Ill. 461, 469.

To a partial extent the senior Desideratos entrusted several financial affairs to Virginia. Virginia helped to secure the $12,500 mortgage in 1953. She hired and paid the contractors to do the remodeling work. After 1956, she collected money from the residents on the first floor to pay the expenses of the household. And, as plaintiff points out, she helped to arrange the conveyance by contacting the lawyer's office under her father's direction, ordering the deeds, and paying the fees. Furthermore, the family trusted Virginia in her performance of these services. However, there is no evidence that the extent of this relationship constituted the type and extent of domination and influence required for the existence of a fiduciary or confidential relationship with reference to conveyance of the property.

In addition, while Virginia did graduate from high school and had several office jobs including that of a legal secretary, we cannot say that Giuseppe had no business acumen. He was a policeman in Italy and worked in the United States for the telephone company 27 years before retiring. Giuseppe and Angelina did not speak English fluently, but there is some evidence they spoke broken English. Giuseppe could at least read English to a limited extent. Even so, the lawyer at the 1960 conveyance spoke both English and Italian.

■■ As a result, we find the evidence not sufficient to prove a fiduciary or confidential relationship by the clear and convincing evidence required. (*Edwards*, 61 Ill. App. 3d 1023, 1027.) Since no such relationship was proved, plaintiff failed to meet his burden and it was unnecessary for defendants to prove the fairness of the transaction. *Edwards*, 61 Ill. App. 3d 1023, 1028.

In the case before us the decisive issue is one of fact as to the existence of a fiduciary relationship between these parties with respect to the matter of the conveyance of the real estate. As above shown there were instances in which the trial court was confronted with conflicts in the evidence. After hearing and giving careful consideration to all of the evidence before it, the trial court arrived at the conclusion that no constructive trust should be created here.

In such a situation, we cannot reverse the conclusion reached by the trial judge unless we can say that the result he reached is contrary to the manifest weight of the evidence. (*Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 110, 382 N.E.2d 1205.) It follows that no grounds for setting aside the conveyance exist.

Plaintiff's remaining contentions concerning certain testimony and exhibits allegedly improperly excluded do not involve or have bearing upon the existence of a fiduciary or confidential relationship, upon which this decision turns. We thus find it unnecessary to consider them. The judgment is accordingly affirmed.

Judgment affirmed.

McGLOON and O'CONNOR, JJ., concur.